**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| ELIZA HOPPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-CV-4-AGF-NAB |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | |
| Acting Commissioner of Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of

Social Security's final decision denying Eliza Hopper's ("Hopper") application for benefits

under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. § 1381 *et seq.* Hopper alleged

disability due to depression, anxiety, and bipolar disorder. (Tr. 235.) This matter was referred to

the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1). For the

reasons set forth below, the undersigned recommends that the Administrative Law Judge's

("ALJ") decision be upheld.

**I.      Background**

On March 25, 2008, Hopper initially filed an application for supplemental security

income ("SSI"). (Tr. 181-183.) Her application was denied and she filed a timely request for a

hearing before an ALJ. (Tr. 74-78, 81.) The Social Security Administration granted her request

and a hearing took place on October 7, 2009. (Tr. 56, 89-93.) Hopper and vocational expert

---

[1] At the time this case was filed, Michael J. Astrue was the Commissioner of Social Security. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Carolyn W. Colvin for Michael J. Astrue in this matter.

George Harne testified at the hearing. (Tr. 1240-1256.) Hopper was represented by counsel. *Id.* On November 5, 2009, the ALJ issued a written decision upholding the denial of benefits. (Tr. 56-61.) On January 28, 2011, the Appeals Council granted Hopper's request for review and remanded the case to an ALJ. (Tr. 68-70.) The Appeals Council ordered the ALJ to (1) obtain additional evidence concerning Hopper's impairments in order to complete the administrative record; (2) evaluate all of Hopper's medically determinable impairments pursuant to the sequential process; (3) further evaluate Hopper's mental impairments in accordance with the special technique; (4) further evaluate claimant's subjective complaints and provide a supporting rationale; (5) give further consideration to Hopper's residual functional capacity ("RFC") and provide the appropriate rationale with specific references to the evidence; and (6) if warranted, obtain supplemental evidence from the vocational expert to clarify the effect of the assessed limitations on Hopper's occupational base. (Tr. 69.)

Upon remand, another ALJ held a second hearing on June 28, 2011. (Tr. 34-49.) At the administrative hearing, the ALJ heard testimony from Hopper, and vocational expert Janice Haskert ("VE Haskert"). (Tr. 34-49.) On July 21, 2011, the ALJ issued a second written opinion upholding the denial of benefits. (Tr. 11-26.) On November 7, 2012, the Appeals Council denied Hopper's request for a review of the ALJ's decision. (Tr. 1-3.) The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Hopper filed this appeal on January 4, 2013. [Doc. 1.] The Commissioner filed an Answer on March 12, 2013. [Doc. 9.] Hopper filed a Brief in Support of her Complaint on April 11, 2013. [Doc. 11.] The Commissioner filed a Brief in Support of the Answer on July 2, 2013. [Doc. 16.]

## II.  Standard of Review

The SSA defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A).

The Social Security Administration uses a five-step analysis to determine whether a person is disabled. 20 C.F.R. § 416.920(a)(1). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004). In this sequential analysis, the claimant first cannot be engaged in substantial gainful activity. 20 C.F.R. § 416.920(b). Second, the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities. 20 C.F.R. § 416.920(c). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix to the applicable regulations. 20 C.F.R. § 416.920(d). If the claimant's impairment meets or equals a listed impairment, the claimant is found disabled without considering age, education, or work experience. 20 C.F.R. § 416.920(d).

Fourth, if the claimant's impairment does not meet a listed impairment, the claimant's RFC will be assessed based on the relevant medical and other evidence in the case record. 20 C.F.R. § 416.920(e). At this step, the burden rests with the claimant to establish his or her RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 416.945(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.945(b)-(e). The ALJ will review a claimant's

RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 416.920(f). If it is determined that the claimant can still perform past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(f). If the claimant cannot perform past relevant work, the analysis proceeds to step five.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(g)(1). At this step, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs in the economy. *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000). If the claimant can make an adjustment to other work, he will not be found disabled. 20 C.F.R. § 416.920(a)(4)(v).

This court reviews decisions of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994). Therefore, even if this Court finds that there is a preponderance of evidence against the weight of the ALJ's decision, this Court will affirm the decision if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

## III. ALJ's Decision

The ALJ determined that Hopper has not engaged in substantially gainful activity since March 14, 2008. (Tr. 13.) The ALJ found that Hopper had the severe impairments of obesity, disorder of the back, borderline intellectual functioning[2], generalized anxiety disorder, dysthymic disorder, fibromyalgia, and depressive disorder. (Tr. 13-14.) The ALJ then determined that Hopper did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-16.)

Next, the ALJ found that Hopper had the RFC to perform light work, as defined in 20 C.F.R. § 416.967(b), except that she can perform simple to intermediate tasks, but is limited to jobs that do not demand attention to details or complicated job tasks or instructions. (Tr. 16.) Additionally, the ALJ found that Hopper may work in proximity to others, but is limited to jobs that do not require close cooperation or interaction with co-workers, in that it would be best for her to work in relative isolation with limited to occasional interaction and cooperation with the public. (Tr. 16-17.) The ALJ also found that Hopper retained the ability to maintain attention and concentration for a minimum two-hour period-of-time, accept supervision on a basic level, and adapt to changes in the work place on a basic level. (Tr. 17.) Based on the RFC, the ALJ determined that Hopper was able to perform her past relevant work as a production assembler

[2] Borderline intellectual functioning is an IQ between 71-84. Diagnostic and Statistical Manual of Mental Disorders 740 (4th ed. Text Rev. 2000) ("DSM-IV-TR").

and a ticketer. (Tr. 25-26.) Therefore, the ALJ concluded that Hopper was not under a disability, as defined in the Social Security Act, from March 14, 2008 through July 21, 2011. (Tr. 26.)

## IV. Administrative Record

The following is a summary of relevant evidence before the ALJ:

### A. Hearing Testimony

#### 1. Hopper's Testimony

Hopper testified that she was thirty-one years old at the time of the first hearing. (Tr. 38.) She earned a high school diploma, but received no vocational training or other further education (Tr. 38, 1243.) She lives in a house with her two minor children, ages one and seven, and the father of her children, who is disabled. (Tr. 38-39.) Since 2004, Hopper was employed at Kohl's for approximately a month in 2007. (Tr. 39.) Hopper stated that she left her job at Kohl's because she did not have patience with the customers and had problems with stooping and sweeping. (Tr. 1244.)

Hopper testified that she suffers from pain in her lower back and discs, which affects her movements such as turning and lifting. (Tr. 42-43.) She testified that a doctor told her that either injections or surgery might help to relieve her back pain. (Tr. 42.) She testified that she also suffers pain in her hands, legs, and elsewhere in her body due to fibromyalgia. (Tr. 43, 1244-1245.) Hopper also testified that she has been diagnosed with irritable bowel syndrome, which causes pain in her kidney area and causes a sudden urgency to use the bathroom. (Tr. 43, 1249.) She seldom cooks and washes dishes sometimes. (Tr. 44.) If she attempts to peel potatoes, for example, her hands become frozen. (Tr. 44, Tr. 1245.) Hopper stated that when she attempts to wash dishes, she may make it through six items before she has to sit down. (Tr. 44.)

Hopper testified that she suffered from panic attacks and high anxiety every day to every other day. (Tr. 41.) She stated that during these panic attacks, it feels like she has a ton of bricks on her chest and she cannot breathe. (Tr. 41.) Hopper testified that she had many days where she did not want to leave the house. (Tr. 41.) She also testified that she will not get out of bed some days because of depression, anxiety, and pain from fibromyalgia. (Tr. 41-42.) Hopper testified that she has memory problems as well. (Tr. 43.) She stated that she often forgets what day it is and has to be reminded about appointments by her mother and her children's father. (Tr. 43-44). She also testified that she is easily distracted and sometimes forgets what she is doing in the middle of a task. (Tr. 44.)

Hopper testified that she has a driver's license, but prefers not to drive. (Tr. 39, 1246.) Hopper stated she has panic attacks when she drives. (Tr. 39-40, 1246.) Her mother and her children's father drive her to go shopping or doctor's appointments. (Tr. 40-41, 1251.) If she absolutely has to go shopping, she gets the least that she can so she can get in and out of the store quickly. (Tr. 40, 1251.) She stated that she has tried to socialize, but she does not do well with the public or people. (Tr. 40.)

Hopper testified that she undergoes mental health treatment every two to three months. (Tr. 45.) She is currently taking medicine for her mental health issues. (Tr. 44-45.) She stated that her medicine helps at times, but does not help at other times. (Tr. 45.) She stopped taking medication while she was pregnant with her second child, but has since resumed with her medication. (Tr. 45.)

### 2.    VE Testimony

#### a.    VE Harne

VE George Harne testified that a hypothetical 29 year old with a twelfth grade education who could perform work at all exertional levels with mild to moderate limitations for understanding and remembering tasks, for sustained concentration and persistence, for socially interacting with the general public, and adapting to work place changes could perform medium unskilled work such as kitchen helper, cook helper, and laundry worker. (Tr. 1255.) Harne stated that light unskilled jobs could include small products assembler, office helper, and housekeeping cleaner. (Tr. 1255.) He testified that no one would be able to perform those jobs if markedly limited in the aforementioned mental functions. (Tr. 1255.) He also stated that all of the aforementioned jobs require bilateral manual dexterity of a frequent to constant basis; therefore a person limited to occasional handling or fingering would be unable to work in the aforementioned jobs. (Tr. 1255.)

#### b.    VE Haskert

VE Haskert testified that Hopper's previous work experience as a production assembler and ticketer was unskilled, light exertional work, with an SVP[3] of 2. (Tr. 46-47.) The ALJ posed the following hypothetical question to VE Haskert:

> Assume we have an individual of the same age, educational background as the Claimant, same work history. For the purpose of this first hypothetical, assume she retains the capacity to perform the full range of light and that she could lift and carry 20 pounds, occasionally, 10 pounds frequently, walk or stand for 6 of 8 hours, sit for 6 of 8, that she retains the ability to do simple and medium tasks, is limited to jobs that do not demand detailed or

---

[3] SVP is the acronym for "specific vocational preparation time; i.e., how long it generally takes to learn a job." *See Fines v. Apfel*, 149 F.3d 893, 895 (8th Cir. 1998).

> complicated instructions or job tasks, and may work in proximity to others, but is limited to jobs that do not require close cooperation and interaction with coworkers, and that she would work better in relative isolation. She could undergo only occasional cooperation interacting with the general public. Assume she retains the ability to maintain attention and concentration within a two hour period of time, adapt to changes in the workplace at a basic level, accept supervision at a basic level. Can this person return to her past relevant work? (Tr. 47.)

Based on that hypothetical, VE Haskert testified that Hopper could perform her past relevant work as a both a production assembler and a ticketer. (Tr. 47-48.)

The ALJ then asked VE Haskert whether a hypothetical person with the above physical limitations, who also would be unable to maintain successful levels of punctuality and attendance, and by her description, would miss an excessive amount of work, would still be able to perform the above jobs. (Tr. 48.) VE Haskert testified that she could not perform the aforementioned jobs and that there would not be any other work in the economy that the above hypothetical person would be able to do. (Tr. 48.)

## B. Medical Records[4]

### 1. North Jackson Family Clinic

Hopper received primary care treatment from North Jackson Family Clinic between August 2004 and March 2005. During this time period, Hopper was treated for anxiety, depression, gastroenteritis, gallstones, left foot pain, migraines, and, insomnia. (Tr. 346-379, 384-385, 637-670, 675-676.)

### 2. Dr. Harold Antwine

Dr. Harold Antwine treated Hopper for a fractured ankle in October 2004. (Tr. 382-383, 628-629.) Dr. Antwine gave Hopper a cam walker boot and then two weeks later a non-weight

---

[4] Most of the medical records are duplicated two or more times in the medical record. The undersigned will not cite to all of the repetitions in this opinion.

bearing short leg cast. (Tr. 628-629.) On December 6, 2004, Hopper visited Dr. David A. West regarding the fracture. (Tr. 380, 671.) Dr. West, an orthopedic surgeon, determined that there were no surgical options available and Hopper should have initially been placed in a short leg walking cast, non-weightbearing. (Tr. 380, 671.) Hopper told Dr. West she was non-compliant, because she had a five month old child; therefore it was difficult to be non-weight bearing. (Tr. 380, 671.)

### 3.    Dr. Michael A. Saridakis

On January 25, 2005, Dr. Michael A. Saridakis treated Hopper for symptomatic cholelithiasis[5] and recommended surgical removal of her gallbladder. (Tr. 342-343, 633-634.) Hopper had the surgery and healed without complication. (Tr. 632.)

### 4.    St. Francis Hospital

Hopper visited St. Francis Hospital for emergency room care several times between July 2004 and November 2010. During those visits, Hopper was treated for low back pain, spina bifida[6] of the lumbar spine, acute myofascial strain, cough, and premature labor. (Tr. 598, 808-809, 1017, 1179, 1187, 1190, 1197.)

### 5.    Pathways

Hopper received treatment from Pathways for mental health treatment in 2006 and 2008. (Tr. 454-489.) Between February and November 2006, Hopper was diagnosed with major depressive disorder and general anxiety disorder. (Tr. 468, 471-478.) During the initial consultation, she received a Global Assessment of Functioning Score ("GAF")[7] of 53. (Tr. 469.)

---

[5] Cholelithiasis is "the presence of concretions in the gallbladder or bile ducts." Stedman's Medical Dictionary 339 (27th ed. 2000).

[6] Spina bifida is the embryologic failure of the fusion of one or more vertebral arches. Stedman's Medical Dictionary 1671 (27th ed. 2000).

[7] Global Assessment Functioning score is a "clinician's judgment of the individual's overall level of functioning. Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Rev. 2000) ("DSM-IV-TR").

A GAF of 53 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR at 34. Hopper's GAF ranged between 50 and 55 during her treatment in 2006. (Tr. 471-478.) She was discharged due to an extended lapse in services in February 2007. (Tr. 454.) Hopper returned to Pathways for treatment on April 22, 2008. (Tr. 479-489.)

### 6. Dr. Bruce Preston

Dr. Bruce Preston met with Hopper for a consultative examination on August 6, 2008. (Tr. 498-500.) Dr. Preston examined Hopper and determined that she had no motor or sensory deficits and her deep tendon reflexes were 2+ in both knees. (Tr. 500.) He also found that she had multiple tender points, a normal gait, and did not use any assistive devices. (Tr. 500.) Dr. Preston diagnosed Hopper with depression, fibromyalgia, and irritable bowel syndrome. (Tr. 500.) He opined that a major obstacle to her employment was her psychiatric state, but that it could be improved with psychiatric care, counseling, and medication. (Tr. 500.) He also opined that her fibromyalgia would benefit from her being employed and getting more physical exercise as long as it did not involve a lot of strenuous activity. (Tr. 500.)

### 7. Kenneth Burstin, Ph.D.

Dr. Kenneth Burstin, a psychologist, completed a psychiatric review technique regarding Hopper on August 26, 2008. (Tr. 506.) Dr. Burstin diagnosed her with major depressive disorder and general anxiety disorder. (Tr. 509-510). He determined that she had mild restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 514.) Dr. Burstin opined that there was no clear evidence of inherent inability to comply with treatment, which had and could be expected to

improve her condition. (Tr. 516.) He also opined that with reported past response to treatment, she would be unable to meet the duration requirements. (Tr. 516.)

### 8. Behavioral Healthcare

Hopper began psychiatric treatment at Behavioral Healthcare in September 2008 and the treatment continued into March 2012. (Tr. 539-542, 603-608, 622-625, 1067-1090, 1093-1126, 1163-1172, 1227-1234.) Drs. Jeffrey Hammer and Elizabeth Bhargava, licensed clinical social worker Anne Heselton, and nurse practitioners Patricia Carson and Becky Godby treated Hopper at Behavioral Healthcare. During Hopper's treatment, she was diagnosed with major depression, general anxiety disorder, borderline intellectual functioning, and dysthymic disorder. (Tr. 526, 531, 535, 607.) During this time, her GAF score ranged between 45 and 58. (Tr. 1069, 1072-1073, 1075, 1078-1079, 1082.) She reported that she does the cooking and cleaning at her house, has a full-time responsibility of taking care of her children, and that she likes to work outside with flowers. (Tr. 530, 534. 541, 1227.) Dr. Jeffery Hammer opined that Hopper was manipulative and drug-seeking. (Tr. 535.) Hopper also reported that her primary care physician accused her of being drug-seeking. (Tr. 537.) When she began her treatment, Hopper continually requested different medications, but by March 20, 2012, she was psychiatrically stable on her medications. (Tr. 526, 532, 603, 607, 624, 1167, 1169, 127, 1231.)

Carson, a family nurse practitioner, prepared a mental medical source statement for Hopper on January 4, 2011. (Tr. 1144-1145.) Carson indicated that Hopper is moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination or proximity to others without being distracted by them, make simple work related decisions; complete a normal workday; ask simple questions or request assistance, accept instructions and respond to

appropriately to criticism; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel to unfamiliar places or use public transportation; set realistic goals or make plans independently of others. (Tr. 1144-1145.) Carson did not indicate that Hopper had any marked or extreme mental impairments. (Tr. 1144-1145.)

### 9. Dr. Jaime Montoya

Hopper received treatment from Dr. Jaime Montoya at First Care from August 2007 to April 2008. (Tr. 388-450, 717-778.) Dr. Montoya treated Hopper for a variety of ailments and diagnosed her with gastroesophageal reflux disease, migraine headaches, hypertension, irritable bowel syndrome, bi-polar disorder, depression, back pain, anxiety, fibromyalgia, and general anxiety disorder. (Tr. 401-447.) On April 29, 2008, Dr. Montoya authored a letter regarding Hopper's functional limitations. (Tr. 388.) Dr. Montoya opined that as of that date, Hopper's functional ability regarding sitting, standing, walking, lifting, carrying, and handling objects was moderately limited in terms of strength and endurance. (Tr. 388.) He stated that her capacity for understanding and memory and sustained concentration and persistence were not optimal, but functional. (Tr. 388.) He also stated that she might be impaired regarding adaptation and limited social interaction. (Tr. 388.)

### 10. David McVicker, FNP

Hopper received treatment from family nurse practitioner David Vicker between February 2009 and December 2010. McVicker treated Hopper for chronic low back pain, fibromyalgia, bronchitis, chronic obstructive pulmonary disease. (Tr. 574-583, 612-620, 784-793, 1037-1064, 1202-1211.) An x-ray of her lumbar spine on February 5, 2009, showed early changes of disc degeneration at L4-L5 and to a lesser degree at L3-L4 and spur formation at

various levels.  (Tr. 1063.)  An MRI of her lumbar spine on June 18, 2009 showed desiccation, disc space narrowing and diffuse disc bulging at L3-L4 and L4-L5 with superimposed posterior central disc protrusions and inferior extrusions at each level, additional posterior annular margin tears at each level, and exaggerated normal lordosis.  (Tr. 1061-1062.)  A MRI of the lumbar spine on January 4, 2011 showed no significant change from the June 18, 2009 MRI.  (Tr. 1202-1203.)

McVicker completed three medical source statements regarding Hopper.  On May 27, 2009, McVicker opined that Hopper could lift and/or carry five pounds frequently and 10 pounds occasionally.  (Tr. 545.)  He stated she could stand and/or walk for 1 hour throughout the day and less than fifteen minutes continuously.  (Tr. 545.)  He determined that she could sit for less than one hour throughout the day and less than fifteen minutes continuously.  (Tr. 545.)  McVicker stated pushing and pulling were limited and she could never climb or crawl.  (Tr. 546.)  He also opined that she should avoid any exposure from extreme heat or cold, dust, fumes, hazards, and heights.  (Tr. 546.)

On the same date McVicker completed a mental medical source statement stating that Hopper was markedly limited in the ability to perform activities within a schedule, sustaining an ordinary routine, asking simple questions, or requesting assistance, and in the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 548-549.)  He also stated that she was extremely limited in most areas of mental functioning, including understanding and memory functions, sustained concentration, and pace, social interaction, and adaptability.  (Tr. 548-549.)

McVicker completed another physical medical source statement regarding Hopper on June 17, 2011.  (Tr. 1237-1238.)  In the June 2011 statement, McVicker opined that Hopper

could lift and/or carry 10 pounds frequently; stand and/or walk less than fifteen minutes continuously and less than one hour total; sit 15 minutes continuously and less than an hour throughout the day; and had no strength to push or pull. (Tr. 1237.) He also opined that she could never climb, kneel, reach, or finger and only occasionally balance, stoop, handle, and feel. (Tr. 1238.) McVicker indicated that Hopper had to avoid any exposure to extreme heat and cold, wetness, humidity, hazards, and heights. (Tr. 1238.) McVicker also stated that she needed to lie down or recline every 20 minutes for 15 to 20 minutes to alleviate symptoms and her medications caused drowsiness and grogginess. (Tr. 1238.)

### 11.    Charles Kenneth Bowles, Ph.D.

Dr. Charles Kenneth Bowles completed a Psychiatric Review Technique and Mental RFC Assessment for Hopper on March 12, 2010. (Tr. 1127-1141.) He diagnosed Hopper with depression, general anxiety disorder, and attention deficit disorder. (Tr. 1128, 1130, 1131.) He opined that her conditions would cause a mild degree of limitation in activities of daily living and a moderate degree of limitation in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace. (Tr. 1135.) He noted that the medical evidence did not indicate any changes in Hopper's condition, other than her pregnancy since the initial denial of benefits. (Tr. 1138.) Dr. Bowles opined that she could perform basic unskilled work. (Tr. 1138.)

In the Mental RFC Assessment, Dr. Bowles opined that Hopper was markedly limited in the ability to understand, remember, and carry out detailed instructions. (Tr. 1139.) He also determined that she was moderately limited in the ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and

the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 1140.)

### 12.    Dr. Douglas Green

Hopper received treatment from Dr. Douglas Green on March 2, 2011 for  consultation regarding her lower back pain.  (Tr. 1214-1218.)  Hopper reported a gradual onset in symptoms and a significant worsening of pain resulting from lifting.  (Tr. 1214.)  Hopper described the pain as moderate and stabbing. (Tr. 1214.)  Dr. Green's examination showed that Hopper's range of motion was mildly limited by pain in the cervical spine, her flexion, extension, and bilateral bending were moderately limited by pain in the lumbar spine, her gait was antalgic and with a limp on the right side, and her deep tendon reflexes were diminished.  (Tr. 1216.)  The remainder of her physical examination was substantially normal.   Dr. Green diagnosed Hopper with degenerative disc disease and a herniated nucleus pulposus.  (Tr. 1217.)  Green recommended weight loss, smoking cessation, and for Hopper to consider physical therapy or a spinal cord stimulator in the future.  (Tr. 1217.)

### 13.    Dr. Joseph Gaeta

On March 3, 2011, Dr. Joseph Gaeta, cardiologist, responded to medical interrogatories from the ALJ.  In his response to the interrogatories, Dr. Gaeta opined that Hopper had no medical impairments and no limitations from a medical physical viewpoint.  (Tr. 1146-1150.)  Dr. Gaeta did indicate, however, that the medical evidence supported Hopper's allegations that she had depression, anxiety, and bi-polar disorder.  (Tr. 1148.)

## V.    Discussion

Hopper asserts three errors on appeal.  First, Hopper argues that the ALJ failed to indicate the weight, if any, given to Nurse McVicker's June 2011 opinion.  Second, Hopper contends that

the ALJ tendered an arbitrary RFC by failing to follow the methodology of SSR 98-6p.  Finally, Hopper asserts that the ALJ did not properly assess Hopper's credibility under SSR 96-7p.

## A.  RFC Determination

Hopper asserts that the failure to weigh nurse practitioner McVicker's June 2011 opinion and granting significant weight to the opinions of Dr. Bowles, the state agency consultant and nurse practitioner Carson resulted in an arbitrary RFC determination not supported by medical evidence in the record.  Hopper states that these alleged errors by the ALJ require reversal.  The Commissioner concedes that the ALJ erred in failing to discuss the June 2011 opinion of nurse practitioner McVicker, even though it was submitted a few days before the ALJ's decision.[8]  The Commissioner states, however, that the ALJ's RFC determination is supported by substantial evidence in the record as a whole.

### 1.  McVicker

First, the undersigned will address the failure to weigh nurse practitioner McVicker's opinion.  The RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 416.945(a). The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis.  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his or her limitations.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  "Although the ALJ bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence, a claimant's [RFC] is a medical question.  *Hutsell v. Massanari*,

---

[8] The Appeals Council added McVicker's June 2011 opinion and other medical records to the administrative record. (Tr. 1-3.)

259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).

Therefore, an ALJ is "required to consider at least some supporting evidence from a [medical] professional." *Lauer*, 245 F.3d at 704. An RFC determination will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

> Social Security separates information sources into two main groups: *acceptable medical sources* and *other sources*. It then divides *other sources* into two groups: *medical sources* and *non-medical sources*. *Acceptable medical sources* include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, *id.*, (2) only acceptable medical sources can provide medical opinions, and (3) only acceptable medical sources can be considered treating sources.

*Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (internal citations omitted) (emphasis in original). Medical sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists." 20 C.F.R. § 416.913(d)(1). "Information from these other sources cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose." SSR 06-03P, 2006 WL 2329939. "[I]nformation from such other sources, [however], may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function. *Id.*; 20 C.F.R. § 404.1513(d). The case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources . . .who have seen the claimant in their professional capacity." SSR 06-03p.

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the

disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-3p.

In this case, it is clear that the ALJ did not include any discussion of McVicker's third medical source statement. Based on the evidence in the record, as a whole, the undersigned finds that the ALJ's failure to address McVicker's June 2011 medical source statement was erroneous, but harmless as it would have no practical effect on the outcome of the case. First, McVicker's June 2011 statement was substantially similar to the May 2009 statement, indicating a few slightly more restrictive limitations. The ALJ gave no weight to the opinions in McVicker's May 2009 medical source statements, because it appeared that the opinions were based on Hopper's subjective complaints. (Tr. 24.) Second, McVicker's June 2011 statement was not consistent with the medical record as a whole. For example, McVicker referred Hopper to Dr. Douglas Green, a neurosurgeon, for consultation regarding her lower back in March 2011. (Tr. 1214.) Dr. Green examined Hopper and reviewed her MRIs from June 2009 and January 2011. (Tr. 1215-1218). Dr. Green's examination showed that Hopper's range of motion was mildly limited by pain in the cervical spine, her flexion, extension, and bilateral bending were moderately limited by pain in the lumbar spine, her gait was antalgic and with a limp on the right side, and she had deep tendon reflexes were diminished. (Tr. 1216.) The remainder of her physical examination was substantially normal. (Tr. 1216.) Dr. Green recommended conservative treatment, smoking cessation, and weight loss for Hopper. (Tr. 1217.) However, the functional limitations in McVicker's June 2011 medical source statement indicate much more

substantial limitations.  Third, McVicker's treatment records also fail to support the substantial limitations contained in the medical source statements.  An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where the deficiency probably has no practical effect on the outcome of the case. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996.)  Therefore, the ALJ's failure to consider the opinions set forth in McVicker's June 2011 medical source statement was harmless and does not constitute grounds for reversal.

### 2.  Nurse practitioner Carson and Dr. Bowles

Next, Hopper contends that the RFC is not supported by substantial evidence, because the ALJ erred in giving substantial weight to the opinions of nurse practitioner Carson and Dr. Bowles.  In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record."  20 C.F.R. § 416.927(b); *see also Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009).

Carson, a family nurse practitioner, provided psychiatric treatment to Hopper from March 2010 to January 2011.  The ALJ gave significant weight to Carson's opinion in January 2011, stating that Carson's opinion was consistent with the treatment notes and the RFC determination that Hopper had no marked limitations based on her impairments.  (Tr. 23.)  Although the ALJ gave significant weight to Carson's opinion, her opinion that Hopper only had moderate limitations was consistent with the moderate limitations found by Dr. Montoya, Dr. Bowles and other medical evidence in the record.  During most of her psychiatric treatment at Behavioral Healthcare, all of Hopper's treatment advisors consistently determined she had only moderate limitations in her overall functioning level.  (Tr. 1069, 1072-1073, 1075, 1078-1079, 1082.)  Further, Hopper's mental condition improved with medication and counseling.  The ALJ could

properly consider Carson's opinion in the assessment of the RFC, because it came from a treating source and the opinion was consistent with the other evidence in the medical record. Moreover, the ALJ did not rely solely upon Carson's opinion in the formulation of the RFC determination.

Hopper also contends that the ALJ should not have given substantial weight to Dr. Bowles, a non-examining state agency consultant. The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). However, it is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment. *Harris v. Barnhart,* 356 F.3d 926, 931 (8th Cir.2004). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole." *Id.*

Again, although the ALJ stated that he gave substantial weight to Dr. Bowles opinion, this opinion is consistent with the other medical evidence in the record. Hopper asserts that Dr. Bowles' opinion conflicts with nurse practitioner McVicker's opinion and Dr. Preston's opinion. As noted, Dr. Preston examined Hopper once in 2008. Dr. Preston opined that Hopper's major obstacle to her employment was her psychiatric state, but he also stated that it could be improved with psychiatric care and that she would benefit from being employed and getting more physical exercise. (Tr. 500.) McVicker, not an acceptable medical source, completed three medical source statements for Hopper that indicated she had severe disabling symptoms, that were not consistent with the other evidence in the medical record. The ALJ can give greater weight to a

medical opinion of a specialist and greater weight to an opinion that is supported by other evidence in the record. *See Brown v. Astrue*, 611 F.3d 941, 953 (8th Cir. 2010) (Greater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist); 20 C.F.R. § 416.927(c)(4) (An ALJ can accord more or less weight to a medical opinion based on its consistency with the record as a whole). Therefore, the ALJ could grant greater weight to the opinion of Dr. Bowles over the opinions of nurse practitioner McVicker and Dr. Preston.

**B.**        **Credibility Determination**

Hopper also contends that the ALJ erred by improperly assessing her credibility. "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them. *Id.* The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints. *Id.* The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

*Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005). "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence." *Id.* The ALJ, however, "need not explicitly discuss each *Polaski* factor." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. *Id.* Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Polaski at 1322.* Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988).

In this case, the ALJ indicated that Hopper's credibility was diminished, because she alleged disabling symptoms that were inconsistent with her activities of daily living that included taking care of her home, disabled husband, and two small children. (Tr. 21-22.) He also noted that she had a poor work history, her medical condition improved with treatment, and there was some evidence of drug seeking behavior. (Tr. 21-23.) The ALJ could consider these factors in determining Hopper's credibility. *See* Goff *v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (ALJ can disbelieve subjective complaints if there are inconsistencies in the evidence as a whole and lack of corroborating evidence is just one of the factors the ALJ considers); *Fredickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004) (claimant's credibility lessened when considering sporadic work record reflecting relatively low earnings and multiple years with no reported earnings); *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (ALJ could consider that claimant

functioned as the primary caretaker for her home and two small children). Based on the foregoing, the ALJ considered several factors in evaluating Hopper's credibility and the ALJ's credibility determination was supported by substantial evidence in the record as a whole.

**VI.     Conclusion**

For reasons set forth above, the undersigned recommends that the Commissioner's decision be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief which Hopper seeks in her Complaint and Brief in Support of Plaintiff's Complaint be **DENIED**.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 27th day of February, 2014.

      /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE